*Indem. & Ins. Co.,* 287 N.Y. at 38, 38 N.E.2d at 120–21 (quoting *Pink*).

Westinghouse has petitioned the district court to compel Seller to order the Escrow Agents to release the PPA award from the Escrow Fund pursuant to the Escrow Agreement; Seller seeks to set off its obligation against the judgments in its favor on the Note and Lease. In this context, these obligations are not "due to and from the same persons in the same capacity," *Vogt Mfg.,* 227 N.Y. at 473, 125 N.E. 831, because Westinghouse, standing in Buyer's place, asserts its claim for the monies in escrow in the capacity of a trust beneficiary, while Seller, who is owed the remaining balances on the Note and Lease, asserts its claim in the capacity of an unsecured creditor.

We therefore conclude that the obligations at issue in this case are not mutual, and therefore Seller may not invoke the doctrine of setoff in order to escape its obligation to order the Escrow Agents to release the PPA.

### III. CONCLUSION

For the foregoing reasons, the decision of the district court, denying its motion for summary judgment, dismissing its claim against the Escrow Fund, granting Seller's motion for summary judgment, and directing the Escrow Agents to pay the entire Escrow Fund to Seller, is vacated. The case is remanded to the district court for further proceedings not inconsistent with this opinion.

UNITED STATES of America, Appellee,

v.

Pablo FERNANDEZ–ANTONIA, aka "Pablo Fernandez", Defendant–Appellant.

Docket No. 01–1030.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 2001.

Decided Jan. 29, 2002.

Henry E. Mazurek, Jr., New York City (Kramer Levin Naftalis & Frankel, New York City, of counsel), for Appellant.

Harry Sandick, Assistant United States Attorney, Southern District of New York, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Jamie L. Kogan, Assistant United States Attorney, Southern District of New York, New York City, of counsel), for Appellee.

Before: MESKILL and JACOBS, Circuit Judges, and LYNCH, District Judge.*

MESKILL, Circuit Judge:

Defendant-appellant Pablo Fernandez–Antonia (Fernandez–Antonia) appeals from a judgment of the United States District Court for the Southern District of New York, Buchwald, *J.*, convicting him, after a guilty plea, of violating 8 U.S.C. § 1326 by unlawfully entering the United States after having been removed.[1] In the district court, Fernandez–Antonia moved to withdraw his guilty plea and dismiss the indictment. He argued that he was prejudiced by the fundamental unfairness of his removal proceeding and thus his removal

properly could not form an element of the criminal offense to which he had pled guilty.

The district court held that the removal proceeding was not fundamentally unfair because Fernandez–Antonia could not demonstrate that he was prejudiced by any deficiencies in the proceeding. The district court concluded that there was no "reasonable likelihood" that Fernandez–Antonia would have escaped removal even if he had appealed the removal order and been granted a new hearing. Based on this holding, the district court denied Fernandez–Antonia's motion to withdraw his guilty plea and his motion to dismiss the indictment. The district court then sentenced him to a term of imprisonment of 57 months with two years supervised release, and imposed a mandatory assessment of $100. As part of its sentencing calculation, the district court enhanced Fernandez–Antonia's offense level by sixteen, concluding that his prior conviction in New York state of attempted robbery in the third degree constituted a violent felony under U.S. Sentencing Guidelines § 2L1.2(b)(1)(A).

On appeal, Fernandez–Antonia contends that his removal proceeding was fundamentally unfair because it suffered from procedural flaws and thus he is entitled to relief on collateral review. He also claims that the district court incorrectly enhanced his sentence. We find no merit in either claim.

In order to obtain relief on collateral review, Fernandez–Antonia had to demonstrate prejudice resulting from procedural flaws in his removal proceeding. The dis-

---

* Honorable Gerard E. Lynch, United States District Judge for the Southern District of New York, sitting by designation.

1. In 1996, Congress amended the immigration laws to distinguish between "removal" and "deportation" hearings. In the context of this case, the distinction between being "removed" and being "deported" has no import. We therefore use the terms interchangeably.

trict court correctly determined that he had failed to do so. The district court also did not err in enhancing Fernandez–Antonia's sentence. Therefore, we affirm the judgment of the district court.

## BACKGROUND

Fernandez–Antonia is a citizen of the Dominican Republic. He illegally entered the United States prior to 1991 and remained here until 1997. On April 22, 1991, Fernandez–Antonia was arrested for attempted robbery in the third degree. He was released on bail but failed to appear at a scheduled court conference. In late 1996, Fernandez–Antonia was arrested for selling cocaine to an undercover narcotics officer. He avoided prosecution for the narcotics charges by pleading guilty to disorderly conduct. He also pleaded guilty to attempted robbery in the third degree and attempted bail jumping in the first degree in connection with the 1991 robbery. On December 11, 1997, he was sentenced to a term of imprisonment of one year.

About one week later, Immigration and Naturalization Service (INS) officers visited and interviewed the incarcerated Fernandez–Antonia. At the second of these visits he was given INS Form I–826, entitled, "Notice of Rights and Request for Disposition." Although the Notice of Rights was printed in English, an INS officer read it to Fernandez–Antonia in his native Spanish. The Notice of Rights provided, in pertinent part: "You have the right to a hearing before the Immigration Court to determine whether you may remain in the United Stated[sic].... Upon your request, the officer who gave you this notice will provide you with a list of free legal organizations that may represent you

for free or for a small fee." Although the box for "I request a hearing before the Immigration Court" is marked, Fernandez–Antonia refused to initial next to the box to indicate his assent to that request and also refused to sign the form.

On January 9, 1998, the INS served Fernandez–Antonia with INS Form I–862, a "Notice to Appear" at an INS removal hearing. The Notice to Appear charged Fernandez–Antonia with being in the United States without being admitted or paroled by an immigration officer. The form was printed in English, although an INS officer read it to Fernandez–Antonia in Spanish. The Notice to Appear informed Fernandez–Antonia that he would be provided a list of qualified attorneys who might be available to represent him without charge. A review of Fernandez–Antonia's immigration A-file indicates that the INS officers failed to include this attorney list with the Notice to Appear. The Notice to Appear also provided: "At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge." Fernandez–Antonia requested an immediate hearing.

The INS transferred him from New York City to York, Pennsylvania for his immigration hearing. On January 18, 1998, Fernandez–Antonia signed a form entitled, "Request for Expedited Deportation/Exclusion/Removal Order." [2] The form presents a series of questions in both English and Spanish, although only the English answers on Fernandez–Antonia's form are circled. By the circled answers, Fernandez–Antonia expressed his desire to be removed from the United States, stated that he did not intend to ask the immigration judge to redetermine his bond, that he had not yet been seen by an immigration

---

**2.** This form is not listed in INS regulations as one of the prescribed forms for use in compliance with United States immigration laws and does not carry an identifying form number. *See* 8 C.F.R. § 299.1.

judge, and had not yet been ordered removed.

On January 22, 1998, Fernandez–Antonia appeared before immigration judge Walter Durling with approximately twelve other aliens as part of a group deportation or removal hearing. At the beginning of the hearing, the judge addressed the group as follows:

> Good. Okay. Now I'm the only one talking. If you talk and I don't, I'm not talking to you. I'll postpone your case and have you reappear next month. This way we can [get] this over with as quickly as possible and you can be on your way. Now it's my understanding that all you gentlemen are here today because you're going to, you're willing to accept orders of deportation. It's the only thing I'm doing today. If you think that this hearing is for something else, kindly raise your hand. No one has raised their hand. Now by being here today at this particular hearing you are giving up certain rights that you would otherwise have had. You are giving up your right, first of all, to be represented by a lawyer at no expense to the United States government. . . . You are giving up your right to have the United States government prove to me that you're unlawfully in the United States. You are also giving up your right to have me, the Judge, figure out if there is any way for you lawfully to remain in this country. . . . Now my decision today will be a final decision, you will not have a right to appeal my order, you do not have it by being here today. Now after telling you all of these rights that you are giving up, is there anyone here that wants to change their mind? Just raise your hand if you want to change your mind.

None of the aliens raised a hand.

The immigration judge then proceeded to question the members of the group individually. The judge asked Fernandez–Antonia if he was a citizen or national of the United States, when he had last entered the United States and whether he had been inspected by an immigration official at the time of this entry. Fernandez–Antonia disclosed that he had been convicted of attempted robbery and bail jumping. When the judge told Fernandez–Antonia that he was going to be deported, Fernandez–Antonia asked, "How long will it take, like what I want to do is to leave it [sic] right away." On February 24, 1998, Fernandez–Antonia was removed from the United States to the Dominican Republic.

On or about October 14, 1999, an INS special agent arrested Fernandez–Antonia pursuant to an indictment charging him as a deported alien who has reentered the country in violation of 8 U.S.C. §§ 1326(a) and (b)(2). On January 18, 2000, Fernandez Antonia entered a guilty plea before the United States District Court for the Southern District of New York. On June 1, 2000, Fernandez–Antonia requested and received time from the district court to pursue possible claims of legal deficiencies in his removal order. He then moved to withdraw his guilty plea and dismiss the indictment. On November 15, 2000, the district court denied both motions. On January 9, 2001, the district court sentenced Fernandez–Antonia to a term of imprisonment of 57 months and two years supervised release.

Fernandez–Antonia timely filed this appeal.

## DISCUSSION

On appeal, Fernandez–Antonia argues that (1) the district court abused its discretion by denying his motion to withdraw his guilty plea and denying him an evidentiary

hearing under Federal Rule of Criminal Procedure 32(e) despite his substantiated claim of legal innocence, (2) the trial judge erred in denying his underlying motion to dismiss the indictment based on his collateral attack of the prior deportation order, and (3) his prior conviction for attempted robbery in the third degree does not constitute an aggravated felony under Guidelines § 2L1.2(b)(1)(A) and therefore he should not have received a sixteen-level upward adjustment in his offense level.

## I. *Motion to Withdraw the Guilty Plea*

█ "Motions to withdraw guilty pleas before sentencing are governed by Federal Rule of Criminal Procedure 32(e)." *United States v. Torres*, 129 F.3d 710, 715 (2d Cir.1997). Fed.R.Crim.P. 32(e) states that "the court may permit the plea to be withdrawn if the defendant shows any fair and just reason." A defendant does not enjoy an unfettered right to withdraw his guilty plea. *United States v. Williams*, 23 F.3d 629, 634 (2d Cir.1994). We review a district court's denial of a defendant's motion to withdraw a guilty plea for abuse of discretion. *United States v. Hernandez*, 242 F.3d 110, 112 (2d Cir.2001) (per curiam) (citing *United States v. Maher*, 108 F.3d 1513, 1529 (2d Cir.1997)).

█ " 'In determining whether a "fair and just reason" exists to justify withdrawal of a guilty plea, a district court should consider: (1) the time lapse between the plea and the motion; and (2) whether the government would be prejudiced by a withdrawal of the plea.' " *United States v. Grimes*, 225 F.3d 254, 259 (2d Cir.2000) (per curiam) (quoting *Torres*, 129 F.3d at 715). "However, the government need not demonstrate prejudice where the defendant fails to show sufficient grounds to justify withdrawal of the plea." *Torres*, 129 F.3d at 715.

The district court allowed that Fernandez–Antonia's motion to withdraw his plea was neither a strategy for delay nor prejudicial to the government. However, the district court determined that its decision on the motion would depend on the validity of Fernandez–Antonia's underlying claim that the removal proceeding was fundamentally unfair. The district court then determined that Fernandez–Antonia's claim of prejudice resulting from flaws in the removal hearing did not constitute sufficient grounds to merit a withdrawal of his plea.

Fernandez–Antonia claims that the district court erred in "collapsing" his motion to dismiss the indictment into his motion to withdraw his guilty plea. He argues that the district court should have ruled on the viability of his motion to withdraw his guilty plea and then returned the case to a pretrial stage where Fernandez–Antonia could then conduct a hearing or a factfinding inquiry to attempt to prove the prejudice necessary to dismiss the indictment. This argument is without merit.

The notice of motion addressed to the district court stated that Fernandez–Antonia would move the district court for an order "(i) withdrawing Mr. Fernandez's previously entered guilty plea ... and (ii) dismissing the Indictment against Mr. Fernandez–Antonia." The memorandum of law in support of Fernandez–Antonia's motions is titled: "Memorandum of Law in Support of Pablo Fernandez–Antonia's Pretrial Motions" and the substance of the memorandum (in fact, 15 of the 16 pages devoted to argument) is headed: "This Court Should Dismiss the Indictment Because Mr. Fernandez's Deportation is Invalid."

Fernandez–Antonia blames a "confused method of proceeding" for his decision to address both the guilty plea and the dismissal of indictment arguments in the

same motion. He argues that it resulted in the district court giving "short shrift" to his argument for dismissal of the indictment. It appears, however, that the district court gave more than adequate attention to Fernandez–Antonia's arguments regarding the allegedly inadequate removal. In fact, the district court assumed that the procedural violations alleged by Fernandez–Antonia rendered the removal order inadequate. It then attempted to ascertain what possible prejudice had befallen Fernandez–Antonia because of these assumed procedural inadequacies.

Fernandez–Antonia's admitted sole basis for withdrawing his guilty plea was the alleged invalidity of his removal. If the district court assumed that the removal proceeding was procedurally flawed and yet found that it was not "fundamentally unfair," the court justifiably could not have granted the motion to withdraw the guilty plea. *See, e.g., United States v. Crown,* 1995 WL 600876, at *3–5 (S.D.N.Y. Oct.12, 1995), *aff'd,* 104 F.3d 349 (2d Cir.1996). It is therefore appropriate to determine the adequacy of the district court's holding with respect to the merits of Fernandez–Antonia's motion to dismiss the indictment. Because we hold that the district court was correct in its assessment of Fernandez–Antonia's motion to dismiss the indictment, there could have been no "fair and just reason" for Fernandez–Antonia to withdraw his guilty plea and the district court did not abuse its discretion in denying the motion. *See* Fed.R.Crim.P. 32(e).

## II. *Motion to Dismiss the Indictment*

Fernandez–Antonia argues that the district court erred in denying his motion to dismiss the indictment. Specifically, he argues that the district court incorrectly limited its consideration solely to the issue of whether there was a "reasonable likeli-

hood" that he could have escaped deportation.

We review *de novo* the district court's denial of Fernandez–Antonia's motion to dismiss the indictment, as it entails mixed questions of law and fact. *See FDIC v. Providence Coll.,* 115 F.3d 136, 140 (2d Cir.1997) (noting that "mixed questions of law and fact are . . . reviewed *de novo* "); *cf. United States v. Paredes–Batista,* 140 F.3d 367, 376–79 (2d Cir.1998) (implicitly employing a *de novo* review in a § 1326 collateral challenge); *United States v. Fares,* 978 F.2d 52, 56–58 (2d Cir.1992) (same); *see also United States v. Meraz–Valeta,* 26 F.3d 992, 997 (10th Cir.1994) (explicitly employing a *de novo* standard of review in a § 1326 collateral challenge).

### A

Although the Supreme Court has not specifically delineated the procedural safeguards to be accorded aliens in deportation or removal hearings, it is well settled that the procedures employed must satisfy due process. *See Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."). " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Doe v. Simon,* 221 F.3d 137, 139 (2d Cir.2000) (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). Because removal proceedings are civil rather than criminal, various due process protections normally associated with criminal trials are not required. *See INS v. Lopez–Mendoza,* 468 U.S. 1032, 1038, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984); *United States v. Valdez,* 917 F.2d 466, 469 (10th Cir.1990).

In *United States v. Mendoza–Lopez,* 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), the Supreme Court held that an alien could collaterally challenge the validity of a deportation order when the order is being used to form the element of a criminal offense and the alien has been denied any possibility of judicial review. *See id.* at 838–39, 107 S.Ct. 2148. The Court alluded to procedural defects that "are so fundamental that they may functionally deprive the alien of judicial review," but refused to delineate what those procedural defects might be. *Id.* at 839 n. 17, 107 S.Ct. 2148.

Congress effectively codified the holding in *Mendoza–Lopez* by amending 8 U.S.C. § 1326 as follows:

> [A]n alien may not challenge the validity of [a] deportation order ... unless the alien demonstrates that—(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). The requirements are conjunctive, and thus Fernandez–Antonia must establish all three in order to succeed in his challenge to his removal order.

Fernandez–Antonia argues that the immigration judge violated established INS rules by failing to ascertain properly whether he made a knowing and voluntary waiver of his right to counsel or his right to appeal an adverse decision. He also argues that the immigration judge erred in not instructing him that he would have been eligible for discretionary relief. Fernandez–Antonia contends that these failings satisfy the first two requirements of § 1326(d), and the district court assumed as much. We need not decide whether his

contention is correct, because we hold that he has failed to meet the final requirement, a showing that "the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d)(3).

**B**

■ An alien is entitled to a new deportation hearing whenever he shows on direct appeal that "a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute, and the INS fails to adhere to it." *Waldron v. INS,* 17 F.3d 511, 518 (2d Cir.1994); *see also Montilla v. INS,* 926 F.2d 162, 168–69 (2d Cir.1991). This is true even if the rules provide more procedural protections than would be required under the Fifth Amendment Due Process Clause. *See id.* at 167 (citing *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)). No showing of prejudice to the alien is required. *See Waldron,* 17 F.3d at 518.

Fernandez–Antonia argues for just such a rule on collateral review. He argues that if he can demonstrate that his removal proceeding suffered from a fundamental procedural flaw, his removal order should automatically be invalidated. Such a result is contrary to principles established by Circuit precedent.

■ For an alien to succeed in collaterally attacking his deportation order, he "must show not only that he was effectively deprived of his right of direct appeal, but also that the administrative proceedings were fundamentally unfair in some respect that would have entitled him to relief on direct appeal." *Fares,* 978 F.2d at 57; *accord Paredes–Batista,* 140 F.3d at 378.

In *United States v. Fares,* we explained that the Supreme Court in *Mendoza–Lopez* did not inquire specifically whether the

alien in that case had been prejudiced by the procedural inadequacies of the hearing. The government had asked the Court to " 'assume that respondents' deportation hearing was fundamentally unfair,' and the Court acceded to that request, 'accepting' the lower court's legal conclusion 'that the deportation hearing violated due process.' Thus, the Court in effect assumed the existence of prejudice without explicitly addressing whether a showing of prejudice was required." *Fares*, 978 F.2d at 57 (quoting *Mendoza–Lopez*, 481 U.S. at 839, 840, 107 S.Ct. 2148). We held in *Fares* that in order to mount a successful collateral attack on a deportation hearing based on a denial of direct review, an alien is required to show prejudice resulting from that denial. *Id.*

The courts of appeals that have addressed this question have unanimously required a similar showing of prejudice. *See United States v. Lopez–Vasquez*, 227 F.3d 476, 483 (5th Cir.2000) (holding that an alien must show fundamental unfairness, denial of direct review and actual prejudice); *United States v. Wittgenstein*, 163 F.3d 1164, 1170–71 (10th Cir.1998) (holding that a showing of fundamental unfairness requires a showing of prejudice); *United States v. Loaisiga*, 104 F.3d 484, 488–89 (1st Cir.1997) (holding that a collateral attack could not succeed because there was no prejudicial error); *United States v. Espinoza–Farlo*, 34 F.3d 469, 471 (7th Cir.1994) (agreeing with other circuits that require a showing of prejudice in addition to a showing of no direct review); *United States v. Proa–Tovar*, 975 F.2d 592, 595 (9th Cir.1992) (affirming prior case law requiring prejudice); *United States v. Santos–Vanegas*, 878 F.2d 247, 251 (8th Cir.1989) (holding that a "success-

ful collateral attack on a deportation order requires a showing of actual prejudice"); *United States v. Holland*, 876 F.2d 1533, 1536 (11th Cir.1989) (noting that "[c]aselaw . . . indicates that fundamental unfairness requires a showing that specific errors prejudiced the defendant").

Fernandez–Antonia concedes that a showing of prejudice is required but contends that our decision in *United States v. Paredes–Batista* allows him to show prejudice merely by demonstrating procedural flaws in the removal proceeding.[3] In *Paredes–Batista*, an alien claimed both that he had been denied his right to direct appeal and that his deportation proceeding was otherwise fundamentally unfair. With respect to the alien's direct appeal argument, our inquiry followed the precedent set by *Fares*, and extended only to whether he would have been able to escape deportation on direct appeal. *Paredes–Batista*, 140 F.3d at 378. Then, citing *Fares*, we explained that "[a] showing of prejudice may also be based on defects in the deportation proceeding itself—if they rendered the proceeding so 'fundamentally unfair' in some respect that the alien would have been entitled to relief on direct appeal." *Id.* (citing *Fares*, 978 F.2d at 57). In upholding the district court's denial of Paredes–Batista's challenge to the validity of his deportation, we stated:

> We are persuaded that, had Batista exercised his right to direct appeal, contending that his counsel's performance and the telephonic nature of the deportation hearing rendered the proceeding "fundamentally unfair," the deportation order would have been upheld. In this respect, we agree with [the district court's] finding that the deportation

---

**3.** Notably, the amended provisions of 8 U.S.C. § 1326 did not apply in *Paredes–Batista*. *See* *Paredes–Batista*, 140 F.3d at 369, n. 1.

hearing "comported with the basic requirements of due process."

*Id.* at 379 (citation omitted).

Fernandez–Antonia misreads *Paredes–Batista,* asserting that the type of "relief on direct appeal" that he must show is only that his removal order would have been invalidated and he would have been granted a new hearing, regardless of whether ultimately he would have been deported. In essence, he equates procedural flaw with prejudice. The holdings in both *Fares* and *Paredes–Batista* are contrary to this reading as both are based on the belief that the aliens in those cases would have been deported even absent any procedural flaws in their proceedings. Contrary to Fernandez Antonia's reading, *Paredes–Batista* did not establish a means of demonstrating prejudice simply by showing procedural errors in the deportation hearing. Rather, it reaffirmed that in order to demonstrate prejudice an alien must show that his proceeding contained errors so fundamental that he might have been deported in error. *Accord Santos–Vanegas,* 878 F.2d at 251 (defining prejudice as errors that "may well have resulted in a deportation that would not otherwise have occurred"). The alien needs to prove that he might not have been deported had he been able to exercise his right of direct appeal; he must make some showing that the result might have been different.

> The Eighth Circuit instructs that
>
> the establishment of a fundamentally unfair hearing in violation of due process requires a showing both of a fundamental procedural error and that the error caused prejudice; an error cannot render a proceeding fundamentally unfair unless that error resulted in prejudice. Actual prejudice exists where defects in the deportation proceedings "may well have resulted in a deportation that would not otherwise have occurred."

*United States v. Torres–Sanchez,* 68 F.3d 227, 230 (8th Cir.1995) (quoting *Santos–Vanegas,* 878 F.2d at 251) (footnote and internal citations omitted).

The purpose of collateral review in a § 1326 prosecution is to afford an alien the opportunity to have some judicial review of his deportation proceeding. *See Fares,* 978 F.2d at 57 (noting that " 'an alternative means of obtaining judicial review must be made available *before* the administrative order may be used to establish conclusively an element of a criminal offense' " (quoting *Mendoza–Lopez,* 481 U.S. at 838, 107 S.Ct. 2148) (emphasis in *Fares* )). But this review is only to determine whether the proceedings were so fundamentally unfair that they resulted in a deportation that might not otherwise have occurred. *See Torres–Sanchez,* 68 F.3d at 230. If the alien would have been deported even after a procedurally perfect proceeding, "he would have stood before the courts just as he does now." *Proa–Tovar,* 975 F.2d at 595. "The lack of direct appeal [would] only result[ ] in his leaving at a somewhat earlier time." *Id.* Accordingly, we hold that in order for an alien to demonstrate on collateral review that his hearing was so fundamentally unfair that it constituted a denial of his Fifth Amendment right to due process, he must show both a fundamental procedural error and prejudice resulting from that error. In order to show prejudice, he must show that, absent the procedural errors, he would not have been removed.

### C

■ We decline to state the quantum of proof necessary for an alien to succeed in his demonstration of prejudice because Fernandez–Antonia has made virtually no showing of a possibility that he would not have been removed even after a procedurally perfect removal proceeding. He thus

would have failed to demonstrate prejudice under either formulation used most often by courts. *Compare United States v. Sanchez–Peralta,* 1998 WL 63405, at *12 (S.D.N.Y. Feb.13, 1998) (requiring that there be a "reasonable likelihood" that the alien would not be deported), *with United States v. Jimenez–Marmolejo,* 104 F.3d 1083, 1086 (9th Cir.1996) (requiring a "plausible" showing that the alien would not be deported).

A review of Fernandez–Antonia's case makes clear that even if the inadequacies in his removal proceeding amounted to fundamental procedural errors, he cannot show that those errors prejudiced him because he cannot make even a plausible showing that he might have been granted discretionary relief. Fernandez Antonia pleaded guilty to attempted robbery in the third degree, a crime that meets the definition of "aggravated felony" under 8 U.S.C. § 1101(a)(43)(G). *See infra* Part III. "[A]n alien convicted of an aggravated felony shall be conclusively presumed to be deportable." 8 U.S.C. § 1228(c). It is unlikely, given this express statutory presumption, that an immigration judge would have granted Fernandez–Antonia any discretionary relief.

Fernandez–Antonia argues, however, that he would have been eligible for relief under 8 U.S.C. § 1182(h), commonly referred to as § 212(h), which gives an immigration judge the discretion to waive certain criminal grounds of inadmissibility for an alien seeking a visa, entry, or adjustment of status. 8 U.S.C. § 1182(h). To qualify for such discretionary relief, the alien must be a family member of a United States citizen or legal resident and the immigration judge must determine that a denial of admission to the alien "would result in extreme hardship" to the family member. *Id.*

At oral argument the government seemed to argue that Fernandez–Antonia's prior conviction of attempted robbery rendered him *per se* ineligible for § 212(h) relief because that crime is an aggravated felony. Congress has barred the awarding of discretionary relief only to lawful permanent residents who have been convicted of an aggravated felony. 8 U.S.C. § 1228(c). This provision is inapplicable in this case, however, because Fernandez–Antonia was never a permanent resident. *See Michel,* 21 I. & N. Dec. 1101, 1998 WL 40407 (BIA Jan. 30, 1998) (en banc) (interim decision) (holding that an alien convicted of an aggravated felony is permitted to apply for § 212(h) discretionary relief because he is not a lawful permanent resident).

Although Fernandez–Antonia's conviction for attempted robbery does not act as a *per se* bar to relief, on its face § 1182(h) gives the Attorney General discretion to grant a waiver of inadmissibility only to aliens who have committed specific criminal offenses. *See* 8 U.S.C. § 1182(h) (providing opportunity for waiver of application of § 1182(a)(2)(A)(i)(I) (crime of moral turpitude); § 1182(a)(2)(A)(II) (crime involving 30 grams or less of marijuana); § 1182(a)(2)(B) (two or more crimes with aggregate sentence of confinement of five years or more); § 1182(a)(2)(D) (prostitution and commercialized vice); § 1182(a)(2)(E) (person involved in serious criminal activity who has asserted immunity from prosecution)). Although it appears that Fernandez–Antonia's criminal history does not place him squarely within any of the enumerated provisions, the government does not argue that the statute is inapplicable on this ground. Thus, we will assume for purposes of this case only that Fernandez–Antonia could be granted relief under the statute. We therefore will address his claim of hardship on its merits.

"Extreme hardship" in the context of a § 212(h) waiver has been construed quite narrowly, and the waiver is considered to be a form of "exceptional" relief. *See INS v. Jong Ha Wang*, 450 U.S. 139, 145, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981) (per curiam) ("The Attorney General and his delegates have the authority to construe 'extreme hardship' narrowly should they deem it wise to do so. Such a narrow interpretation is consistent with the 'extreme hardship' language, which itself indicates the exceptional nature of the suspension remedy."). Most, if not all, deportations involve some type of family hardship. *See United States v. Arce–Hernandez*, 163 F.3d 559, 564 (9th Cir.1998). The key is that in order for a § 212(h) waiver to be granted properly, the hardship must be "extreme."

Any hardship caused by Fernandez–Antonia's deportation is far from "extreme." Fernandez–Antonia would have to rely on his putative father, Rafael Lopez–Taveras, to sponsor his application for his visa. As an initial matter, the district court noted that "the evidence that Mr. Lopez–Taveras is in fact defendant's father is rife with self-contradiction and inconsistency." *United States v. Fernandez–Antonia*, 2000 WL 1716436, at *6 (S.D.N.Y. Nov.15, 2000). Mr. Lopez–Taveras did not name Fernandez–Antonia as one of his five children in his application to be a lawful permanent resident. When questioned by an INS officer in 1997, Fernandez–Antonia named as his father a person with a different name than Mr. Lopez–Taveras. As the district court observed, "[g]iven Mr. Taveras's lawful presence in the United States, it seems odd that defendant would not forthrightly answer that question if Mr. Taveras is indeed his father." *Id.* at *6 n. 8.

Putting those concerns aside, however, we find it difficult to imagine an immigration judge finding Fernandez–Antonia's situation arduous enough to classify it as "extreme hardship." First, Fernandez–Antonia's three children and their mother live in the Dominican Republic. Second, the emotional support and family connection that Fernandez–Antonia allegedly provides to his father is not enough to merit the extraordinary relief of a § 212(h) waiver. *See Chiaramonte v. INS*, 626 F.2d 1093, 1101 (2d Cir.1980) ("While 'extreme hardship' has no precise definition, the cases are consistent in finding it lacking where the deportation would result in nothing more than the emotional or even financial tribulations which generally follow the separation of a family." (citing cases)). Therefore, because Fernandez–Antonia's removal would not cause uncommon or extraordinary familial difficulty, he would not be able to make the required showing of "extreme hardship" necessary for a § 212(h) waiver.

### III. *Aggravated Felony Enhancement*

■ Finally, Fernandez–Antonia argues that the district court erred in determining that his New York state conviction for attempted robbery in the third degree met the definition of "aggravated felony" in § 2L1.2(b)(1)(A) of the U.S. Sentencing Guidelines. Specifically, he argues that the New York statute defining "attempt" is overly broad and encompasses activity not considered criminal under federal law. We find no merit in this argument.

### A

■ A sentencing court employs a "categorical approach" in determining whether a conviction under state law fits within the federal sentencing guidelines and thus merits an offense level enhancement. This categorical approach "generally requires the trial court to look only to the fact of the conviction and the statutory

definition of the prior offense." *Taylor v. United States*, 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990); *United States v. Galicia–Delgado*, 130 F.3d 518, 520 (2d Cir.1997).

Under § 2L1.2(b)(1)(A), a sentencing court can increase by sixteen an alien's offense level if the court finds that the alien committed an aggravated felony as defined by 8 U.S.C. § 1101(a)(43). *See* U.S. Sentencing Guidelines Manual § 2L1.2, cmt. n. 1. Section 1101(a)(43)(G) includes in its definition of "aggravated felony," "a theft offense (including receipt of stolen property) . . . for which the term of imprisonment [is] at least one year." Section 1101(a)(43)(U) brings within this definition "an attempt or conspiracy to commit an offense described in this paragraph."

The New York attempt statute states that "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." N.Y. Penal Law § 110.00. The federal criminal law requires that in order for a defendant to be guilty of attempt, he must take a "substantial step" toward the commission of the offense with the intent to commit the crime. *See, e. g., United States v. Manley*, 632 F.2d 978, 987–88 (2d Cir.1980).

### B

 Fernandez–Antonia argues that we are bound by the language of the New York statute when determining if conduct criminalized by the New York statute is not covered by the federal criminal law. It is axiomatic, however, that when interpreting state statutes federal courts defer to state courts' interpretation of their own statutes. *See, e. g., Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. 70, 76, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000) (per curiam) ("As a general rule, this Court defers to a state court's interpretation of a state statute."); *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 119 (2d Cir.2001) (noting that "we must defer to the [state] [s]upreme [c]ourt on issues of state law"). We are thus guided not only by the language of the statute itself but also by New York courts' interpretation of the statute.

 It is settled law in New York that in order for a defendant to be guilty of an attempt he has to have "carr[ied] the project forward within dangerous proximity to the criminal end to be attained." *People v. Werblow*, 241 N.Y. 55, 61, 148 N.E. 786, 789 (1925) (Cardozo, J.) (citing *Hyde v. United States*, 225 U.S. 347, 387, 32 S.Ct. 793, 56 L.Ed. 1114 (1912) (Holmes, J., dissenting)). This principle has been repeated time and again by New York courts. *See People v. Acosta*, 80 N.Y.2d 665, 676, 593 N.Y.S.2d 978, 985, 609 N.E.2d 518, 525 (1993) ("This Court has held that Penal Law § 110.00 requires a showing that defendant 'committed an act or acts that carried the project forward within dangerous proximity to the criminal end to be attained.'" (Smith, J., dissenting) (quoting *People v. Warren*, 66 N.Y.2d 831, 832, 498 N.Y.S.2d 353, 354, 489 N.E.2d 240, 241 (1985))); *People v. Bracey*, 41 N.Y.2d 296, 300, 392 N.Y.S.2d 412, 415, 360 N.E.2d 1094, 1097 (1977); *People v. Fair*, 269 A.D.2d 91, 94, 711 N.Y.S.2d 196, 198 (3d Dep't), *leave denied*, 95 N.Y.2d 963, 722 N.Y.S.2d 480, 745 N.E.2d 400 (2000); *In re Phoenix G.*, 265 A.D.2d 554, 555, 697 N.Y.S.2d 121, 123 (2d Dep't 1999).

The New York courts thus make clear that a defendant must perform conduct quite severe in order to be convicted of the crime of attempt. The difference between the federal law's requirement of a "substantial step" and the New York law's requirement of "dangerous proximity" is,

as the district court correctly noted, "more semantic than real." We thus conclude that the district court did not err in concluding that Fernandez–Antonia's conviction of attempted robbery in the third degree constituted an "aggravated felony" under U.S. Sentencing Guidelines § 2L1.2(b)(1)(A).

## CONCLUSION

Fernandez–Antonia suffered no prejudice as a result of any procedural flaws in his removal proceeding. He thus cannot successfully collaterally challenge the use of his removal as an element of a crime. In addition, the district court did not err in upwardly adjusting Fernandez–Antonia's offense level for his conviction of an aggravated felony. This decision of the district court was well supported by New York case law.

The judgment of the district court is affirmed.