■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SIVAD T. DAVIS, Appellant. [687 NYS2d 803] —Cardona, P. J. Appeal from a judgment of the County Court of Broome County (Mathews, J.), rendered March 25, 1998, upon a verdict convicting defendant of the crime of robbery in the first degree.

At approximately 9:00 A.M. on May 4, 1997, a gunman robbed the Giant Market at 56 Main Street in the City of Binghamton, Broome County, of $27,300. The robber, a black male, wore a brown jacket with a hood, baggy blue jeans and tan work boots. Defendant was charged with, *inter alia*, robbery in the first degree upon the theory that he aided and abetted the actual

robber. Following a jury trial during which the defense called no witnesses, defendant was convicted and sentenced, as a second violent felony offender, to a definite prison term of 18 years. Defendant appeals contending that his conviction was against the weight of the evidence though his argument also appears to challenge its legal sufficiency. We begin our analysis with a review of the evidence at trial.

Shortly after the robbery, Mark Yonaty, the owner of an apartment building near the Giant store, observed a man matching the robber's description exit the building while looking back and forth over his shoulders. Yonaty saw the man enter the back seat of a white Toyota Celica parked at 50 Main Street. There were two other occupants of the automobile, the driver who was a white male and a front seat passenger, a black male. Yonaty told police what he saw and gave them the vehicle's license plate number.

Rita Phoreman, a resident of 51 Main Street, was returning home that morning when she saw two black men running from the direction of the Giant store into the alley between 50 and 52 Main Street. One of them was wearing a brown coat with a hood. Thereafter, both Yonaty and Phoreman viewed the store surveillance videotape and identified the robber as the man they had seen in the brown-hooded coat.

During the investigation, the police learned that the driver of the white Toyota Celica was Terry Martin. Martin told the police that, on that morning, by prior arrangement, he drove defendant, who was his co-worker, and a man defendant identified as his brother, to 50 Main Street so that defendant could retrieve mail from his previous apartment. Martin indicated that both men left the car and entered 50 Main Street. They were gone about 10 minutes and did not return together. Defendant arrived back first and defendant's brother returned a short time later and got into the back seat. Although Martin had driven defendant on previous occasions, defendant, for the first time, gave him specific directions to his residence at 31 Hazel Street. The route avoided several traffic lights and a portion of Main Street. Martin stated that he dropped the pair off and went to work arriving at 9:10 A.M. When Martin was shown the surveillance videotape, he indicated the robber looked like defendant's brother.

On the day of the robbery, the police also interviewed defendant who confirmed that, on that morning, he had been with Terry Martin and a close friend "Ace", with whom he had grown up in New York City. He indicated that he did not know Ace's real name or where he lived but that Ace had called him a few

weeks before wanting to visit. Defendant agreed that he asked Martin to drive them to 50 Main Street but claimed he told Martin he wanted to pick up some stereo speakers left behind when he moved. Defendant could not provide the police with a name, description or the apartment number of the person who had the speakers. In contrast to Martin's observation, defendant told the police that they could not enter 50 Main Street so he went into the Giant store to buy a newspaper and left Ace in the alley. When he returned, Ace told defendant that he had to go to the bathroom and remained in the alley. The surveillance videotape indicates that the robbery occurred less than one minute after defendant left the store. After viewing the videotape, defendant confirmed that Ace wore the same clothes as the robber. Defendant told the police that after Martin dropped them off, he went to a video store. Upon his return, he learned that Ace was preparing to leave by cab. According to the cab driver, when Ace left he was carrying a large duffel bag that appeared full.

A search of defendant's apartment revealed two bundles of money each containing $50 in $1 bills. The money was found in defendant's bedroom, one under his mattress and the other in the closet. The bundles were from currency deliveries made to area Giant stores on May 1, 1997 and May 2, 1997. Defendant's girlfriend, Monique Forbes, stated that when she made the bed the morning of the robbery the money was not there. She testified that she waited in the apartment until Ace left and never saw him go into the bedroom. Despite defendant's claim that he did not know Ace's whereabouts, Forbes testified that following his arrest, defendant gave her a phone number to contact Ace to tell him to turn himself in to clear defendant. Notably, Forbes made the call from an outside line because defendant was concerned about wiretaps. After placing the call, Forbes threw the phone number away.

Eleven-year-old Nakia Forbes testified that she saw defendant and Ace leave the apartment with Martin on the morning of the robbery. When they returned, she saw defendant and Ace go into the bathroom with a duffel bag. When they emerged, Ace had changed his clothes. The police also recovered from the bedroom a pair of blue jeans bearing a distinctive white pattern on the back pocket and a pair of brown cloth work gloves similar to those worn by the robber in the surveillance videotape.

Initially, we note that by arguing that he "was entitled as a matter of law to have inferences consistent with both guilt and innocence resolved in his favor", defendant appears to be urg-

ing this Court to apply the "moral certainty"[1] standard during appellate review. However, the moral certainty standard is applied only by the trier of fact (*see, People v Norman*, 85 NY2d 609, 620-621; *People v Wong*, 81 NY2d 600, 608, *supra*). An appellate court does not distinguish between direct or circumstantial evidence (*see, People v Rossey*, 89 NY2d 970, 971-972; *People v Cabey*, 85 NY2d 417, 421) when examining the trial evidence for legal sufficiency or performing a weight of the evidence review. Notably, the former presents a question of law (*see, People v Cleague*, 22 NY2d 363, 366) and requires the court to "determine whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People" (*People v Williams*, 84 NY2d 925, 926; *see, People v Wong, supra*, at 608; *see also, People v Bleakley*, 69 NY2d 490, 495). The latter involves a more discrete analysis traditionally stated as follows: "If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' * * * If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict" (*People v Bleakley, supra*, at 495, quoting *People ex rel. MacCracken v Miller*, 291 NY 55, 62 [citations omitted]).

Viewing the trial evidence in the light most favorable to the People, we find that it allowed a rational trier of fact to conclude, based upon reasonable, permissible inferences drawn from defendant's actions, that he was an accomplice (*see*, Penal Law § 20.00) and that all the elements of the crime of robbery in the first degree (*see*, Penal Law § 160.15 [4]) were established beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we find that the jury's verdict was not against the weight of the evidence.

We now turn to defendant's remaining contention. During deliberations, the jury submitted a request to have the surveillance videotape replayed. County Court decided to play the

---

1. It has been stated that in a case such as this, based entirely on circumstantial evidence, "the facts from which the inference of defendant's guilt is drawn must be inconsistent with the defendant's innocence and must exclude to a moral certainty every other reasonable hypothesis" (*People v Giuliano*, 65 NY2d 766, 767-768) "and the defendant is entitled to a jury instruction, in words or substance, to that effect" (*People v Wong*, 81 NY2d 600, 608; *see, People v Daddona*, 81 NY2d 990, 992).

tape in open court and allow the jurors to take it into the jury room. At the court's direction, the prosecutor played the tape for the jury in court and showed the foreperson how to run the VCR. Defendant argues that by authorizing the Assistant District Attorney to replay the tape, County Court violated the mandate of CPL 310.30[2] that it give the requested information. However, since defendant failed to timely object, the issue is not preserved for appellate review (*see*, CPL 470.05 [2]).

Furthermore, we do not find that the failure to make a timely objection falls within the narrow exception to the preservation rule where the error affects the organization of the court or the mode of proceedings prescribed by law (*see*, *People v Patterson*, 39 NY2d 288, 295, *affd* 432 US 197). The *Patterson* rule "goes to the general and over-all *procedure* of the trial, forbidding alteration of mandated procedural, structural, and process-oriented standards" (*People v Gray*, 86 NY2d 10, 21 [emphasis in original]). We perceive no such alteration in the court's delegation of the ministerial act of operating a courtroom VCR. Moreover, inasmuch as the alleged error did not deprive defendant of his right to a fair trial, we decline to exercise our discretionary power to take corrective action in the interest of justice (*see*, CPL 470.15 [6] [a]).

Peters, Spain, Carpinello and Graffeo, JJ., concur. Ordered that the judgment is affirmed.

---

2. CPL 310.30 provides in pertinent part: "At any time during its deliberation, the jury may request the court for further * * * information * * * with respect to the content or substance of any trial evidence * * * Upon such a request, the court * * * must give such requested information".